**RECORD NO. 13-4**

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

ELRICO DARNELL FOWLER,

*Petitioner-Appellant,*

v.

CARLTON JOYNER, Warden,
Central Prison, Raleigh, North Carolina,

*Respondent-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA, AT CHARLOTTE
THE HONORABLE FRANK D. WHITNEY, PRESIDING

**OPENING BRIEF OF APPELLANT
ELRICO DARNELL FOWLER**

Shelagh Rebecca Kenney
Center for Death Penalty Litigation
201 West Main Street, Suite 301
Durham, North Carolina 27701
(919) 956-9545 Tel.
shelagh@cdpl.org

Mark J. Pickett
Center for Death Penalty Litigation
201 West Main Street, Suite 301
Durham, North Carolina 27701
(919) 956-9545 Tel.
mpickett@cdpl.org

*Counsel for Petitioner-Appellant*

# **TABLE OF CONTENTS**

<u>Page</u>

TABLE OF AUTHORITIES ................................................................ iv

INTRODUCTION ...........................................................................1

STATEMENT OF JURISDICTION.....................................................2

ISSUES PRESENTED FOR REVIEW ................................................3

STATEMENT OF THE CASE............................................................4

STATEMENT OF THE FACTS ..........................................................5

SUMMARY OF THE ARGUMENT ....................................................9

STANDARD OF REVIEW ..............................................................10

REQUEST FOR CERTIFICATE OF APPEALABILITY .....................10

ARGUMENTS:

    I.    THE STATE COURTS UNREASONABLY DETERMINED THAT THE ADMISSION OF JIMMY GUZMAN'S IN-COURT IDENTIFICATION OF FOWLER DID NOT DEPRIVE FOWLER OF HIS CONSTITUTIONAL RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT ...............................................................12

        Introduction ...................................................................12

        Relevant Facts ...............................................................13

        State Court Adjudications ................................................18

        Due Process Standard......................................................18

        The State Courts' Application of this Standard Was Unreasonable.................................................................20

i

The Procedure Was Unconstitutional..................................................29

Conclusion..................................................................................33

II.   THE STATE SUPREME COURT UNREASONABLY
      CONCLUDED THAT THE ADMISSION OF THE
      STATEMENTS OF BHARAT SHAH DID NOT VIOLATE
      FOWLER'S RIGHT TO CONFRONTATION UNDER THE
      UNITED STATES CONSTITUTION ...................................................34

      Introduction ................................................................34

      Relevant Facts .............................................................35

      State Court Adjudications .................................................36

      Analysis....................................................................37

      Conclusion .................................................................40

III.  FOWLER WAS DENIED HIS RIGHT TO A FAIR AND
      IMPARTIAL JURY AFTER JIMMY GUZMAN'S IN-COURT
      OUTBURST; THE STATE COURT'S DECISION WAS
      BASED ON AN UNREASONABLE DETERMINATION OF
      THE FACTS AND INVOLVED AN UNREASONABLE
      APPLICATION OF FEDERAL LAW ................................................40

      Introduction ...............................................................40

      Relevant Facts .............................................................42

      State Court Adjudications .................................................48

      Right to Fair and Impartial Jury .........................................49

      Ineffective Assistance of Appellate Counsel ..............................50

      Guzman's Outburst Resulted in a Jury Tainted by Bias .....................51

      Appellate Counsel Rendered Ineffective Assistance ........................58

CONCLUSION ........................................................................59

REQUEST FOR ORAL ARGUMENT .........................................................60

ii

CERTIFICATE OF COMPLIANCE..........................................................................61

CERTIFICATE OF SERVICE ...........................................................................62

# TABLE OF AUTHORITIES

## CASES

Page

*Abdur Raheem v. Kelly*,
257 F.3d 122 (2nd Cir. 2001) ..........................................................32

*Bell v. Jarvis*,
236 F.3d 149 (4th Cir. 2000) ..........................................................51

*Coleman v. Alabama*,
399 U.S. 1 (1970)..............................................................................22

*Crawford v. Washington*,
541 U.S. 36 (2004)............................................................................37

*Duncan v. Louisiana*,
391 U.S. 145 (1968)..........................................................................49

*Foster v. California*,
394 U.S. 440 (1969)....................................................................*passim*

*Fowler v. North Carolina*,
535 U.S. 939 (2002)............................................................................4

*Fowler v. North Carolina*,
556 U.S. 1242 (2009)..........................................................................5

*Frye v. Lee*,
235 F.3d 897 (4th Cir. 2000) ..........................................................10

*Fullwood v. Lee*,
290 F.3d 663 (4th Cir. 2002) ....................................................49, 51

*Goldsmith v. Witkowski*,
981 F.2d 697 (4th Cir. 1993) ..........................................................55

*Idaho v. Wright*,
497 U.S. 805 (1990)....................................................................37, 38

iv

*Irvin v. Dowd*,
    366 U.S. 717 (1961) ....................................................................................49

*Jones v. Cooper*,
    311 F.3d 306 (4th Cir. 2002) .................................................................49

*Jones v. State of Wis.*,
    562 F.2d 440 (7th Cir. 1977) .................................................................25

*Lilly v. Virginia*,
    527 U.S. 116 (1999) ...........................................................................37, 40

*Manson v. Brathwaite*,
    432 U.S. 98 (1977) .................................................................................19

*Miller-El v. Cockrell*,
    537 U.S. 322 (2003) ...............................................................................11

*Miller-El v. Dretke*,
    545 U.S. 231 (2005) ...............................................................................55

*Neil v. Biggers*,
    409 U.S. 188 (1972) .......................................................................*passim*

*Ohio v. Roberts*,
    448 U.S. 56 (1980) .................................................................................37

*Parker v. Gladden*,
    385 U.S. 363 (1966) ...................................................................49, 50, 51

*Payne v. Tennessee*,
    501 U.S. 808 (1991) ...............................................................................52

*Perry v. New Hampshire*,
    __ U.S. __, 132 S. Ct. 716 (2012) .......................................................22

*Remmer v. United States*,
    347 U.S. 227 (1954) ........................................................................50, 54

*Satcher v. Pruett*,
    126 F.3d 561 (4th Cir. 1997) ............................................................19

*Simmons v. United States*,
    390 U.S. 377 (1968)...........................................19, 22, 27, 28, 29

*Slack v. McDaniel*,
    529 U.S. 473 (2000)....................................................................11

*Smith v. Phillips*,
    455 U.S. 209 (1982).....................................................................49

*Smith v. Robbins*,
    528 U.S. 259 (2000).................................................................50, 59

*State v. Fowler*,
    548 S.E.2d 684 (N.C. 2001) ...................................................*passim*

*State v. Fowler*,
    668 S.E.2d 343 (N.C. 2008) ...........................................................5

*Stockton v. Virginia*,
    852 F.2d 740 (4th Cir. 1988) ....................................................53, 54

*Stovall v. Denno*,
    388 U.S. 293 (1967)...............................................................*passim*

*Strickland v. Washington*,
    466 U.S. 668 (1984).................................................................50, 58

*Tennard v. Dretke*,
    542 U.S. 274 (2004)....................................................................11

*Townes v. Murray*,
    68 F.3d 840 (4th Cir. 1995) ..........................................................27

*United States v. Basham*,
    561 F.2d 302 (4th Cir. 2009) ........................................................52

*United States v. Brevard*,
    739 F.2d 180 (4th Cir. 1984) ..........................................................................55

*United States v. Brothers Const. Co. of Ohio*,
    219 F.3d 300 (4th Cir. 2000) ..........................................................................39

*United States v. McHan*,
    101 F.3d 1027 (4th Cir. 1996) ........................................................................39

*United States v. Murphy*,
    696 F.2d 282 (4th Cir. 1982) ..........................................................................39

*United States v. Wilkerson*,
    84 F.3d 692 (4th Cir. 1996) ............................................................................27

*Williams v. Taylor*,
    529 U.S. 362 (2000)..........................................................................29, 31, 38

## STATUTES

21 U.S.C. § 1291 ....................................................................................................3
28 U.S.C. § 2241 ....................................................................................................3
28 U.S.C. § 2253 ....................................................................................................3
28 U.S.C. § 2253(c) ............................................................................................10
28 U.S.C. § 2254 ........................................................................................3, 5, 10
28 U.S.C. § 2254(d) ............................................................................................41
28 U.S.C. § 2254(d)(1)............................................................................10, 12, 34
28 U.S.C. § 2254(d)(2)........................................................................................10

## RULES

Federal Rule of Evidence 701 ..............................................................................52
Federal Rule of Evidence 702 ..............................................................................52

## OTHER AUTHORITIES

*Eyewitness Misidentification*, INNOCENCE PROJECT,
http://www.innocenceproject.org/understand/Eyewitness-Misidentification.php
(last visited Aug. 22, 2013)....................................................................................2

*Informants*, INNOCENCE PROJECT,
http://www.innocenceproject.org/understand/Snitches-Informants.php (last visited
Aug. 22, 2013) ................................................................................................2

Kenneth S. Broun, *Brandis & Broun on North Carolina Evidence*
(6th ed. 2004) ................................................................................................52

Kenneth S. Broun, *McCormick on Evidence* (6th ed. 2006) ...................................52

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 13-4
(3:09-cv-00051-FDW)

_____

ELRICO D. FOWLER,

      Petitioner-Appellant,

v.

CARLTON JOYNER,[1] Warden, Central Prison, Raleigh, North Carolina

      Respondent-Appellee.

_____

BRIEF OF PETITIONER-APPELLANT

_____

Appeal from the United State District Court for the Western District of North Carolina, at Charlotte

<u>Introduction</u>

Elrico Fowler's conviction and death sentence resulted from a panoply of constitutional deprivations. Fowler, who maintains his innocence, was convicted and sentenced to death based almost entirely on eyewitness identification and incentivized informant testimony, two types of evidence associated with a large

_____

[1] Carlton Joyner has been named the new warden at Central Prison.

percentage of wrongful convictions.[2]  The eyewitness who testified in Fowler's case was especially unreliable, having been able to confidently identify Fowler only after viewing his photograph in two separate photographic arrays and then confronting him in a pretrial hearing.  The prejudicial effect of this eyewitness's testimony was then compounded by his extra-testimonial statement to the jury on the appropriateness of a death sentence.  Another eyewitness, whose recorded statements were introduced through police officer testimony, did not identify Fowler in the photographic arrays presented by law enforcement.

For the reasons set forth below, the district court's judgment cannot stand. This Court should issue a certificate of appealability and vacate the lower court's judgment.

## Statement of Jurisdiction

This is an appeal by North Carolina death row prisoner Elrico Fowler from the District Court's denial of a writ of habeas corpus.  Fowler filed a Petition for Writ of Habeas Corpus in the United States District Court for the Western District

---

[2] The Innocence Project has found that "[e]yewitness misidentification . . . play[s] a role in nearly 75% of convictions overturned through DNA testing." *Eyewitness Misidentification*, INNOCENCE                            PROJECT, http://www.innocenceproject.org/understand/Eyewitness-Misidentification.php (last visited Aug. 22, 2013).  Furthermore, "[i]n more than 15% of wrongful conviction cases overturned through DNA testing, an informant testified against the defendant at the original trial."  *Informants*, INNOCENCE PROJECT, http://www.innocenceproject.org/understand/Snitches-Informants.php (last visited Aug. 22, 2013).

of North Carolina, Charlotte Division on February 12, 2009, invoking jurisdiction under 28 U.S.C. §§ 2241 and 2254.

The District Court denied relief on all claims, and entered judgment against Fowler on March 27, 2013. Fowler then filed a timely notice of appeal on April 8, 2013 from the final judgment entered by the District Court.

This appeal is from a final order. This Court has jurisdiction over this appeal pursuant to 21 U.S.C. § 1291 and 28 U.S.C. § 2253.

<u>Issues Presented for Review</u>

I. **DID THE DISTRICT COURT ERR IN CONCLUDING THAT THE STATE COURTS' DETERMINATION THAT THE ADMISSION OF JIMMY GUZMAN'S IN-COURT IDENTIFICATION OF FOWLER DID NOT DEPRIVE FOWLER OF HIS CONSTITUTIONAL RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT WAS NOT UNREASONABLE?**

II. **DID THE DISTRICT COURT ERR IN CONCLUDING THAT THE STATE SUPREME COURT'S DETERMINATION THAT THE ADMISSION OF THE STATEMENTS OF BHARAT SHAH DID NOT VIOLATE FOWLER'S RIGHT TO CONFRONTATION UNDER THE UNITED STATES CONSTITUTION WAS NOT UNREASONABLE?**

III. **DID THE DISTRICT COURT ERR IN CONCLUDING THAT THE STATE COURTS' ADJUDICATION OF FOWLER'S FAIR AND IMPARTIAL JURY CLAIM WAS NEITHER AN UNREASONABLE DETERMINATION OF THE FACTS NOR CONTRARY TO FEDERAL LAW?**

<u>Statement of the Case</u>

On January 29, 1996, Elrico Fowler was indicted for the robbery and murder of Bobby Richmond, as well as for the robbery and assault with a dangerous weapon of Bharat Shah.

On November 10, 1997, Fowler was sentenced to death after the jury found him guilty of all charges.  On July 20, 2001, the North Carolina Supreme Court affirmed the convictions and death sentence.  *State v. Fowler*, 548 S.E.2d 684 (N.C. 2001).  On March 18, 2002, the United States Supreme Court denied Fowler's petition for writ of certiorari.  *Fowler v. North Carolina*, 535 U.S. 939 (2002).

On November 12, 2002, Fowler filed a Motion for Appropriate Relief (MAR) in Mecklenburg County Superior Court.  Fowler filed an amendment to his MAR on November 12, 2004.

By an order filed March 10, 2006, Fowler's MAR and amendments were denied in part.  The state superior court denied, without an evidentiary hearing, MAR claims II through V and VIII and also claims I through III of the amendments to the MAR.  The state superior court granted an evidentiary hearing on claims I and VII of the MAR.  The state superior court deferred ruling on claim VI of the MAR and claims IV through V of the amendments to the MAR pending resolution of the evidentiary hearing.

4

Following an evidentiary hearing on Fowler's claims of ineffective assistance of trial counsel, the state superior court, on October 22, 2007, denied the remainder of the claims in the MAR and the amendments. Fowler timely filed a petition for writ of certiorari with the North Carolina Supreme Court seeking review of the decision of the superior court. The petition was denied on October 9, 2008. *State v. Fowler*, 668 S.E.2d 343 (N.C. 2008). The United States Supreme Court then denied Fowler's subsequent petition for writ of certiorari. *Fowler v. North Carolina*, 556 U.S. 1242 (2009).

On February 12, 2009, Fowler filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. Following the Respondent's Answer and briefing on Respondent's Motion for Summary Judgment, the District Court denied the petition and declined to issue a certificate of appealability on March 27, 2013. Fowler filed a notice of appeal on April 8, 2013.

<u>Statement of the Facts</u>[3]

Fowler maintains his innocence in the robbery of the Howard Johnson's motel and the shooting of Bobby Richmond and Bharat Shah. Before trial, Fowler rejected plea offers under which he could have served as little as fourteen and a half years in prison. JA 1669-70. The State's evidence against Fowler consisted

---

[3] Additional facts are set forth under individual grounds for relief.

largely of the recorded statements of surviving victim Shah, the eyewitness testimony of bystander Jimmy Guzman, and incentivized informant testimony.

Although Shah survived the shooting, he did not testify at trial. The State introduced his recorded statements through the testimony of police officers. JA 250-52, 615-16. Shah was the only declarant who saw the robbery and shooting take place. JA 282. In his statements introduced at trial, Shah said that, shortly before 11 p.m. on December 31, 1995, he was in the Howard Johnson's motel lobby with Richmond when two men entered. JA 11,16-17. One of the men, who carried a gun, told Richmond to lie down, while the other man told Shah to open the register. JA 11, 17. When Shah handed over the money, the man with the gun shot Richmond and Shah, and then shot Shah again when Shah said he could not open the motel safe. JA 11-12, 23-24. The men then fled. JA 12.

While Shah provided police with a description of the men, he never identified Fowler or anyone else in the photographic arrays presented to him by police. JA 11, 17-23, 129-132. The State never identified Fowler's alleged accomplice.

At the time of the shooting, Guzman, the only eyewitness who identified Fowler, was inside the restaurant adjacent to the motel lobby. JA 158, 174. When Guzman heard gunshots, he ran to the door that separated his restaurant from the

6

lobby and peeked through the glass door, where he caught a five second glimpse of a man standing behind the motel's front desk. JA 158-161, 172, 174.

Guzman did not identify Fowler when, eight days after the shooting, he viewed a photographic array that included Fowler's photograph. JA 127, 132, 135, 176. Fourteen days after the shooting, police presented Guzman with another array; this time, Guzman said that, of the six photographs, Fowler's "most closely resembled" the man, but he could not be sure. JA 113, 115-120, 138. Police then told Guzman that Fowler had confessed to the crime. JA 1663.

Shortly before a pretrial suppression hearing for which Guzman was subpoenaed to testify, Guzman met with prosecutors, who told him that Fowler was a suspect in the Howard Johnson's shooting, and that he would be sitting between his lawyers during the hearing. JA 179-80. At the hearing, held twenty-two months after the crime, Guzman was now able to identify Fowler confidently. JA 169-70. Guzman also identified Fowler at trial. JA 431. As he left the witness stand following his trial testimony, Guzman said to Fowler, "I hope you fry man; I really do." JA 473.

Four informants also testified. Leo McIntyre did not tell law enforcement about Fowler's putative inculpatory statements until he himself was indicted on federal drug charges in June 1996. JA 710, 725. In exchange for his testimony, the State agreed to inform the United States Attorney about his cooperation. JA

7

704. McIntyre hoped that this would lead to a sentence reduction. JA 709. According to McIntryre's testimony, Fowler admitted to robbing and shooting two employees at the Howard Johnson's. JA 699-703.

Waymon Fleming had also been indicted on federal drug charges and, like McIntyre, hoped to receive a sentencing reduction in exchange for his testimony. JA 937-941, 946. Fleming also testified that Fowler admitted to committing the Howard Johnson's robbery. JA 915-917.

Ed Adams did not tell police about his supposed conversations with Fowler until September 29, 1997, shortly before Fowler's trial began. JA 891. Adams had a history of making deals with the State in exchange for his testimony; in 1996, Adams's armed robbery charge was reduced to common law robbery when he agreed to testify against a co-defendant, but he was ultimately unable to testify. JA 893-901. At Fowler's trial, Adams testified that, on the night of the crime, he saw Fowler leave a party between 9 and 10 p.m., saying he needed money, and then return later that night. JA 791-93. Adams further testified that, on January 1, 1996, Fowler sold him a gun, which he destroyed. JA 823-837. Finally, Adams testified that while he was in jail with Fowler in April 1996, Fowler told him he was "glad" the gun was destroyed. JA 839, 846.

Jermale Jones contacted police on the advice of his attorney with supposed information about Fowler in the hopes of receiving "help" on an armed robbery

8

charge.  JA 641-42, 657.  He testified that, before the murder, Fowler told him about a plan to rob the Howard Johnson's motel.  JA 636-38.  Then, while the two were in jail together after the crime, Jones claimed Fowler admitted to committing the shooting.  JA 638-40.  Although Jones did not have a formal agreement with prosecution on this matter, he entered into a plea agreement before Fowler's trial for which he received an eighty-six month prison sentence for a charge that carried a maximum sentence of 229 months.  JA 653-43.

The State presented no physical or forensic evidence that connected Fowler to the crime.  There was no DNA evidence, no blood found on Fowler's clothing, and no fingerprints connecting Fowler to the scene.  No murder weapon was introduced at trial.

## Summary of the Argument

Fowler is entitled to relief on the issues presented herein.  The appropriate remedy would be to award Fowler a new trial or a new sentencing hearing.

## Standard of Review

Fowler seeks to appeal the denial of his petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. This Court reviews de novo the question of whether, viewing the evidence in the light most favorable to appellant, the district court erred in granting summary judgment. *See Frye v. Lee*, 235 F.3d 897, 902 (4th Cir. 2000).

In reviewing Fowler's issues, this Court must determine whether the state courts' determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254 (d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254 (d)(2).

## Request for Certificate of Appealability

In denying Fowler's petition for writ of habeas corpus in its entirety, the district court declined to issue a certificate of appealability (COA) on any issue raised in Fowler's petition. Fowler requests a COA on the issues raised in this brief.

In deciding whether a COA should issue, this Court must determine whether "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c) (2013). The prisoner must "demonstrat[e] that jurists

10

of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). The Supreme Court emphasized it is not likelihood of success that governs the issuance of a COA, but whether there is an active debate on the issue:

> A prisoner seeking a COA must prove something more than the absence of frivolity or the existence of mere good faith on his or her part. We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. *Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail.*

*Id.* at 337-38 (internal quotation marks omitted) (emphasis added).

In *Tennard v. Dretke*, the Court instructed: "the 'petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *see also Miller-El*, 537 U.S. at 336 ("Under the controlling standard, a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.").

11

Courts have previously determined that reasonable jurists could disagree about the merits of similar claims and have granted certificates of appealability. These issues could be debated by reasonable jurists and are sufficient to justify encouraging Fowler to proceed with them. Thus, Fowler deserves the opportunity to proceed further with the claims raised herein.

## I. THE STATE COURTS UNREASONABLY DETERMINED THAT THE ADMISSION OF JIMMY GUZMAN'S IN-COURT IDENTIFICATION OF FOWLER DID NOT DEPRIVE FOWLER OF HIS CONSTITUTIONAL RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT.

*Introduction*

The state courts' determination that Jimmy Guzman's in-court identification of Fowler did not violate due process was an unreasonable application of clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1) (2013). This in-court identification was central to the State's case against Fowler. Although two other eyewitnesses viewed photographic arrays that included photographs of Fowler, only Guzman identified Fowler as one of the participants. JA 129, 133, 139, 146-47, 168-69.

Guzman's identification, however, was the product of unnecessarily suggestive law enforcement procedures that, over time, communicated to Guzman that Fowler was the State's chosen suspect. *See Stovall v. Denno*, 388 U.S. 293, 302 (1967). Law enforcement repeatedly presented Fowler to Guzman for

12

identification through both photographic arrays and an in-court confrontation. As more suggestive elements were introduced, Guzman became more certain that Fowler was the culprit. JA 127-135, 138, 168-69. "In effect, the police repeatedly said to [Guzman], 'This is the man.'" *Foster v. California*, 394 U.S. 440, 443 (1969). Consequently, the jury heard Guzman confidently identify Fowler in court, nearly two years after witnessing the crime, even though Guzman had been unable to make a confident identification when presented with Fowler's photograph shortly after the crime.

## *Relevant Facts*

Jimmy Guzman owned the restaurant inside the Howard Johnson's motel. JA 158. At around 11 p.m. on December 31, 1995, Guzman, who was in the restaurant, heard gunshots from the direction of the motel lobby. JA 158, 174. After hearing the shots, he approached the glass door that separates the restaurant from the lobby. JA 158. Guzman then pulled back a sheet of paper that covered the glass door and peered into the lobby. JA 158-59. For five seconds, Guzman observed a man he did not recognize standing behind the motel's front desk about twenty-five feet away. JA 160, 61, 172, 174. He could see the man only from the waist up. JA 161. The man was looking down at first, then turned to look in Guzman's general direction. JA 161-62. Guzman did not see anyone else in the lobby. JA 182. He then ran to his office and called police. JA 173. Later    that

13

night, Guzman told police the man he saw was a black male in his late twenties, between 6' and 6'1" tall, weighing 175 to 180 pounds, and slightly unshaven.  JA 126.  He was wearing a green wool cap and a green military jacket.  JA 126, 163. Guzman said he focused on the man's nose, which he described as long, thin, and pointed.  JA 175.

Police had arrived shortly after the shooting.  Charlotte-Mecklenburg Police Officer J.A. Berg took Guzman and another eyewitness, Page Long, to a nearby service road to view a suspect, Daniel Hunter, who police had detained.[4]  JA 38-41, 179-80.  Long told police, "That's him."  JA 41.  Guzman, however, told Officer Berg that he could not say whether Hunter was the man he saw in the lobby.  JA 178.  Hunter was later eliminated as a suspect.  JA 41-42, 156.

On January 8, 1996—eight days after the crime—Charlotte-Mecklenburg Police Investigators Christopher Fish and Diego Anselmo visited Guzman at his home.  JA 132.  Investigator Anselmo presented Guzman with an array of six color photographs, including one of Fowler.  JA 127, 132.  The photograph of Fowler had been taken two months earlier, and showed him with hair, a beard, and a mustache.  JA 148-49.  Guzman was unable to identify any of the individuals as the man he saw in the lobby.  JA 135, 176.

---

[4] Another witness, Mark Watkins, also attended this showup.  However, he later said he did not see the crime take place.  JA 1714-15.

Two days later, on January 10, 1996, police released Fowler's photograph and the photograph of another suspect, Cullen Marshall, to the media with a statement indicating that Fowler was being sought by police. JA 135-36. The following day, the *Charlotte Observer* published an article that included photographs of Fowler and Marshall. JA 136.

Police again met with Guzman on January 14, 1996 in an attempt to obtain an identification of Fowler. JA 113-127, 166-171. In a meeting with Guzman at the Charlotte Airport, Investigator Fish presented Guzman with an array of six photographs, one of which was Fowler's January 12, 1996 arrest photograph. JA 113, 115, 119. Fowler appeared with a shaved head and light stubble. JA 148-49. The other five photographs were chosen by a computer program that selects participants with similar appearances. JA 115-118. All six photographs appeared on the same page. JA 118. Fowler was the only person who appeared in both this array and the array that police presented to Guzman on January 8. JA 2206. Guzman told Investigator Fish that, of the six photographs, Fowler "most closely resembled" the man he saw in the motel lobby. JA 138. However, he stated he could not be sure whether this was actually the same person. JA 120, 138. At Investigator Fish's request, Guzman signed the back of Fowler's photograph. JA

120-21.  According to Guzman, an officer[5] then told him that the man in the photograph he had chosen had "admitted that he killed someone" and then "went to buy some drugs."  JA 1663.

On April 3, 1996, Investigator Fish met with Guzman in his home to view another six photograph array.  JA 142-44, 150-51.  Fish later testified that the purpose of this array was to see if Guzman had actually seen the other, unarmed robber, although Guzman had, on prior occasions, told police he had seen only one person.  JA 151, 182.  This array did *not* include a photograph of Fowler.  JA 150. Guzman chose two of the photographs as "mostly closely resembl[ing]" the person he saw.  JA 142, 177.   Investigator Fish did not ask Guzman to sign the back of the photographs.  JA 138, 143-44, 151, 182.

Nearly two years after the crime, the Mecklenburg County District Attorney's Office subpoenaed Guzman to testify in a pretrial hearing in Fowler's case on Tuesday, October 14, 1997.  JA 179.  Guzman met with prosecutors in the District Attorney's Office on the Friday before the hearing.  JA 179-80.  According to Guzman, the prosecutors explained that Fowler was a suspect in the Howard Johnson's shooting and that Fowler would be sitting between his attorneys at the defense table during the hearing.  JA 180.

---

[5] It is not clear from the record whether this was Investigator Fish or another officer.  Two other officers came to the airport with Fish, but they were not present during the presentation of the photographic array.  JA 114, 119.

At the hearing, Fowler was in fact sitting between his attorneys and wearing an orange jail jumpsuit.  JA 169-70.  On direct examination, Guzman identified Fowler as "that gentleman over in the middle" between his two lawyers.  JA 168-69.  Upon seeing Fowler in this setting, Guzman stated he was now "confident" that Fowler was the person he saw the night of the crime.  JA 169.  The State then asked Guzman if his identification was "based on [his] memory of seeing [Fowler] at the scene of the crime, or is it based on having seen his photograph at sometime before today?"  JA 169.  Guzman replied that his identification was "based on seeing" Fowler in the motel lobby.  JA 169.  Guzman also stated that he did not recall seeing Fowler's photograph in the news.  JA 180.

During the investigation, officers also attempted to obtain identifications from eyewitnesses Bharat Shah and Page Long, but neither identified Fowler. Shah, a Howard Johnson's employee who was shot during the robbery, viewed two photographic arrays presented by Investigator Fish on January 8, 1996.  JA 129, 132.  Fowler's photograph appeared in at least one of the arrays.  JA 129, 132-33. Shah was not able to identify anyone.  JA 132.  Eyewitness Page Long initially identified Daniel Hunter in a showup shortly after the crime, but Hunter was later cleared as a suspect.  JA 41.  On April 3, 1996, police presented Long with several arrays, including the array viewed by Guzman on January 14 that included Fowler.

17

JA 114-15, 139.  Long did not identify Fowler, and he said two other men—Cullen

Marshall and Terry Springs—were somewhat familiar to him.  JA 139.

### State Court Adjudications

Fowler moved to suppress Guzman's in-court identification in a pretrial

motion, and the trial court held a hearing on October 14, 1997.[6]   JA 189.

Following the hearing, the trial court issued its findings from the bench and denied

the motion.   JA 189-197.   At trial, Guzman identified Fowler over defense

counsel's objection.  JA 431.  On direct appeal, the North Carolina Supreme Court

reviewed the claim on the merits and found no error.  *Fowler*, 548 S.E.2d at 698,

704.

### Due Process Standard

The Supreme Court has held that an eyewitness identification is

unconstitutional and must be suppressed if the procedures used to obtain the

identification were "so unnecessarily suggestive and conducive to irreparable

mistaken identification that [the defendant] was denied due process of law."

*Stovall*, 388 U.S. at 302.  This determination requires a two-prong inquiry.  First,

the court must determine if the identification procedure was unnecessarily

---

[6] Fowler also moved to suppress the results of the photographic arrays, but
withdrew that motion at the hearing.  JA 189.

suggestive. [7]  *Neil v. Biggers*, 409 U.S. 188, 198-99 (1972).  Second, irrespective of the suggestive nature of the procedure, the court must determine if there was a substantial likelihood of misidentification.  *Id*. at 198-99.

Under the first prong, "[a] procedure is unnecessarily suggestive if a positive identification is likely to result from factors other than the witness's own recollection of the crime."  *Satcher v. Pruett*, 126 F.3d 561, 566 (4th Cir. 1997) (applying *Manson v. Brathwaite*, 432 U.S. 98, 110 (1977); *Biggers*, 409 U.S. at 198-99).  In determining whether the procedure was unnecessarily suggestive, the court must balance the suggestive nature of the procedure against the necessity of that procedure in the particular case.  *Biggers*, 409 U.S. at 198 ("unnecessarily suggestive [procedures] are condemned for the further reason that the increased chance of misidentification is gratuitous"); *Simmons*, 390 U.S. at 384-85 (focusing on the necessity of using a suggestive procedure so that the perpetrator could be identified and arrested).  For instance, in *Stovall*, the eyewitness identified her attacker in a hospital room showup while she was recovering from life-threatening injuries sustained during the assault.  388 U.S. at 295.  The Supreme Court held that while "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned[,]" the

---

[7] The Court has used "unnecessarily" and "impermissibly" interchangeably in this analysis.  *Compare Stovall*, 388 U.S. at 302, *with Simmons v. United States*, 390 U.S. 377, 384 (1968).

confrontation in this case was "imperative" because the victim was unable to leave the hospital, she was the only eyewitness, and "[n]o one knew how long [she] might live." *Id.* at 302.

There is a substantial likelihood of misidentification under the second prong of the analysis if the eyewitness's identification was not reliable under the "totality of the circumstances." *Biggers*, 409 U.S. at 199. The Supreme Court has identified five non-exclusive factors to assist in determining whether an identification was reliable: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* at 199-200.

*The State Courts' Application of this Standard Was Unreasonable*

The state courts' application of this due process standard to the Guzman identification was unreasonable in three critical ways. First, the state supreme court unreasonably required Fowler to demonstrate that the State *intended* to elicit a false identification from Guzman. Second, the state courts unreasonably considered—and gave great weight to—Guzman's own assessment of whether his identification was the product of suggestion. Finally, the state courts unreasonably examined each identification procedure separately rather than considering the

20

cumulative effect of Guzman's multiple meetings with law enforcement on his eventual identification of Fowler at the pretrial hearing.

The state supreme court correctly identified the standard as "whether the identification procedure was so suggestive as to create a substantial likelihood of irreparable misidentification." *Fowler*, 548 S.E.2d at 617. In applying this standard to the facts, however, the court found that the procedure was not impermissibly suggestive because "[n]othing in the trial court's findings or in the evidence suggests that the prosecutors *encouraged* Guzman to make a false identification." *Id.* at 618 (emphasis added). The court further noted that "[t]he meeting between prosecutors and Guzman [in which prosecutors told Guzman where Fowler would be seated during the pretrial hearing] appears to have been nothing more than an opportunity to go over what would happen in court." *Id.* Thus, the court concluded that "although prosecutors should avoid instructing the witness as to defendant's location in the courtroom, there is nonetheless insufficient evidence to support defendant's contention that prosecutors rigged Guzman's identification." *Id.*

This imposition of an intent requirement, which focused the court's analysis on whether state agents "encouraged Guzman to make a false identification," was an unreasonable application of clearly established federal law. The Supreme Court has never held that the intent of law enforcement is relevant to determining

21

whether an identification procedure is suggestive. *Perry v. New Hampshire*, __ U.S. __, 132 S.Ct. 716, 721 n.1 (2012). Rather, the question is whether the nature of the procedure itself was unnecessarily suggestive in light of the attendant circumstances. *Biggers*, 409 U.S. at 198.

In *Foster v. California*, 394 U.S. 440 (1969), for example, the Supreme Court held that procedures used to obtain an identification following a robbery violated due process. 394 U.S. at 443. In that case, the Court's analysis of the three identification procedures used by law enforcement—a live lineup, a showup, and a second live lineup—focused *entirely* on the objective facts surrounding the procedures. *Id.* at 441-43. The defendant was taller and dressed differently from the other men in the first lineup. *Id.* at 443. He was then presented to the eyewitness in a suggestive showup, and he was the only participant in the second lineup who was also in the first lineup. *Id.* The Court did not consider the intent of police in using these procedures. *See id.* Discussion of police intent is also noticeably absent in other Supreme Court cases on this issue. *See, e.g.*, *Coleman v. Alabama*, 399 U.S. 1, 6 (1970); *Simmons*, 390 U.S. at 384-86. As the Court stated in *Perry v. New Hampshire*, "our case law makes clear [that] what triggers due process concerns is police use of an unnecessarily suggestive identification procedure, *whether or not they intended the arranged procedure to be suggestive*." 132 S.Ct. at 721 n.1 (emphasis added).

22

In imposing an intent requirement, the state supreme court made it substantially more difficult for Fowler to demonstrate that the identification procedure was unnecessarily suggestive. Proving that state agents were motivated by an improper purpose presents a significantly higher burden than demonstrating that a procedure was unnecessarily suggestive. The meeting in which prosecutors told Guzman where Fowler would be seated during the pretrial hearing—the effect of which was no different from an officer telling an eyewitness which lineup participant is the suspect—is rendered innocuous when analyzed in light of intent. Regardless of the suggestive effect, the prosecutor's *intent* could be interpreted as "nothing more than an opportunity to go over what would happen in court." *Fowler*, 548 S.E.2d at 617. Under clear Supreme Court precedent, this was an unreasonable application of federal law.

The trial court and state supreme court also unreasonably relied on Guzman's expressed confidence in his identification of Fowler in determining whether the identification procedure was suggestive. During the pretrial hearing, Guzman testified that his supposed memory of Fowler was "based on seeing him on the" night of the shooting, and not based on seeing Fowler's photograph at a later date. JA 169. In its findings, the trial court relied on this statement, noting that "Guzman indicated his identification of the Defendant in open Court based upon his recollection of the appearance" of Fowler on the night of the shooting

23

"and not based upon any suggestion or inference in conferences with the police officers or with prosecuting attorneys." JA 192-203. The state supreme court went further, relying on Guzman's self assessment of whether his identification was the product of suggestion to conclude that the procedure was not suggestive. *Fowler*, 548 S.E.2d at 618. The court noted that "Guzman testified he was confident that defendant was the man he saw in the motel lobby" and that his identification was based on "seeing defendant in person . . . and not on seeing photographs of defendant." *Id.* This, the court held, supported the conclusion that "Guzman's identification was not a result of prosecutorial suggestion." *Id.*

This analysis was an unreasonable application of federal law. The Supreme Court has held that eyewitness confidence is a factor to be considered in the reliability prong of the due process analysis, not the suggestiveness prong. *Biggers*, 409 U.S. at 199 (listing "level of certainty" as one factor relevant to assessing reliability). The Supreme Court has never suggested that whether an eyewitness somehow knows he was influenced by subconscious suggestion is relevant to the suggestiveness analysis. Rather, the Court has routinely focused on the objective, observable facts about how the procedure was conducted. *See*, *e.g.*, *id.* at 198; *Stovall*, 388 U.S. at 302. The eyewitness's confidence and assessment of the source of his identification are irrelevant, as "the very harm of an irreparably suggestive confrontation is its capacity to render the witness unable to separate

24

initial recollections from those affected by prejudicial police actions." *Jones v. State of Wis.*, 562 F.2d 440, 444 (7th Cir. 1977).

Finally, the trial court and state supreme court unreasonably applied federal law by failing to consider the cumulative effect of Guzman's repeated interactions with law enforcement on his eventual identification. The trial court's order made several findings with respect to the individual identification procedures, but it did not consider the suggestive effect of viewing Fowler's photograph in two different arrays presented within less than a week of one another. JA 18 9-197. Nor did the court consider the suggestive effect of prosecutors informing Guzman where Fowler would be seated during the pretrial hearing. JA 189-197.

While the cumulative effect argument was central to Fowler's claim at trial, the trial court's order focused on whether the identification procedures were suggestive when considering each session *individually*. JA 185, 193-196. The court did not appear to understand the cumulative effect argument, at one point asking, "Well, if [the procedures] were impermissibly suggestive wouldn't [Guzman] have picked the right one every time?" JA 186. The court's finding that "lack of suggestiveness . . . was . . . bolstered by the fact that Mr. Guzman . . . was unable to choose a photograph of the Defendant on January 8, 1996" also demonstrated a failure to consider the cumulative effect argument. JA 196-97.

The failure to consider the cumulative effect of Guzman's meetings with law

enforcement was unreasonable. In *Foster*, the Supreme Court held that repeated confrontations between the eyewitness and the defendant can violate due process because they "repeatedly sa[y] to the witness, 'This is the man.'" 394 U.S. at 443. As in the present case, police in *Foster* arranged three confrontations between the eyewitness and the defendant: first in a lineup in which the defendant was taller and wore different clothing than the other suspects, then in a showup that same day, and finally in a second lineup held ten days later. *Id.* at 441-42. The eyewitness said he "thought" the defendant was the perpetrator after the first two confrontations, but he could not be sure. *Id.* at 441. Only after the final confrontation did he become "convinced" that the defendant was the right man. *Id.* at 442.

Critically, the Supreme Court in *Foster* did not analyze the individual confrontations separately but rather considered all of the police-arranged confrontations as a single identification procedure. *Id.* at 441-42. In fact, the Court did not identify anything that was suggestive about the second lineup standing alone, even though this confrontation actually produced the unreliable identification. *Id.* The Court recognized that the cumulative effect of repeated exposure to the defendant signaled to the eyewitness that this was the suspect. *Id.* at 442-43.

26

As in *Foster*, Guzman's three confrontations with Fowler were not, for due process purposes, individual procedures to be analyzed separately, but rather constituted a single procedure leading to Guzman's identification at the pretrial hearing. JA 169-70. Before this date, Guzman had never been able to clearly identify Fowler. On January 8, 1996, only eight days after the crime, Guzman viewed Fowler's image for the first time in a six photograph array and was unable to make an identification. JA 127, 132, 135, 176. Less than a week later, on January 14, police presented him with another array that also included Fowler. As with the lineups in *Foster*, Fowler was the only participant common to both arrays. *Foster*, 394 U.S. at 441-42; JA 2206. Guzman told officers that Fowler "most closely resembled" the person he saw, but he was not certain. JA 142, 187. While there is "no flat prohibition against making the same individual be the one constant" in two different identification procedures, the "danger of misidentification is heightened if defendant's picture . . . recurs in [a] lineup." *Townes v. Murray*, 68 F.3d 840, 853 (4th Cir. 1995); *United States v. Wilkerson*, 84 F.3d 692, 695 (4th Cir. 1996) (citing *Simmons*, 390 U.S. at 383).

Following Guzman's tentative selection of Fowler on January 14, law enforcement engaged in further suggestive interactions that virtually guaranteed a confident identification. After Guzman told officers that Fowler's photograph "most closely resembled" the person he saw, the officers "told [Guzman] that [the

man he selected] admitted that he killed someone."[8]  JA 1663.  Providing this feedback was especially suggestive given that Guzman would later make a much more confident identification of Fowler at the pretrial hearing.  *See Simmons*, 390 U.S. at 383 ("[t]he chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime").  Officers had, in effect, independently confirmed Fowler as the "correct" choice while Guzman himself was ambivalent.  Then, just a few days before the pretrial hearing, Guzman met with prosecutors who explained that Fowler was a suspect and that he would be seated between his attorneys at the hearing.  JA 180.  Armed with this information, Guzman confidently identified Fowler at the hearing on October 14, 1997, despite the fact that nearly two years had passed since the crime.  JA 168-69.  The state court's failure to consider the cumulative effect of these events was unreasonable.

The state supreme court's perfunctory analysis of the cumulative effect argument was no less unreasonable.  The court's opinion noted Fowler's "cumulative effect" argument.  *Fowler*, 548 S.E.2d at 619.  The court, however, dispensed with this argument without analysis, concluding that "[t]he sequence of events leading to Guzman's in-court identification was not unnecessarily suggestive."  *Id.*

---

[8] Officers failed to testify to this fact at the pretrial hearing.  It was not revealed until Guzman testified in state post-conviction proceedings.  JA 1663.

As the Supreme Court has made clear, a state court unreasonably applies federal law when it "fail[s] to evaluate the totality of the available [] evidence" in support of a claim. *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000). In *Williams*, the Supreme Court concluded that a state supreme court's analysis of the prejudice prong of an ineffective assistance of counsel claim was unreasonable because it "failed even to mention" the slight mitigation evidence presented by trial counsel as compared to the significant mitigation evidence adduced during state post-conviction proceedings. *Id.* at 398. Similarly, the state supreme court in Fowler's case failed even to mention any facts in support of Fowler's cumulative effect argument, even though this argument was supported by the Supreme Court's *Foster* decision. *Foster*, 394 U.S. at 441-43; *Fowler*, 548 S.E.2d at 619.

### The Procedure Was Unconstitutional

Guzman's in-court identification of Fowler on October 14, 1997 violated due process under the Supreme Court's clearly-established two-prong test. *Stovall*, 388 U.S. at 302. As discussed above, the procedure used by law enforcement was suggestive. Moreover, it was unnecessarily suggestive. Unlike in *Simmons* and *Stovall*, there were no exigent circumstances that made the suggestive procedures necessary. *Simmons*, 390 U.S. at 384-85; *Stovall*, 388 U.S. at 295, 302. Officers did not need Guzman's identification to make an arrest as Fowler had already been arrested on January 12, 1996, two days before officers administered the second

29

photographic array to Guzman.  JA 122.  Additionally, unlike the eyewitness in *Stovall*, Guzman was not the only eyewitness, and he did not receive life-threatening injuries that necessitated his making an immediate identification.  388 U.S. at 302.

Moreover, law enforcement and prosecutors could have taken several simple measures to avoid singling out Fowler.  They could have ensured that Fowler was not the only person whose photograph appeared in both the January 8 and January 14 arrays; they could have avoided telling Guzman they had other evidence against the man he selected; they could have chosen not to tell Guzman where Fowler would be seated in the courtroom; and they could have attempted to obtain a confident identification from Guzman in another photographic array before resorting to a suggestive courtroom confrontation.  Instead, police and prosecutors used procedures that "repeatedly said to [Guzman], 'This is the man.'"  *Foster*, 394 U.S. at 443.

There also was a substantial likelihood that Guzman misidentified Fowler considering the totality of the circumstances.[9]  *Biggers*, 409 U.S. at 198.  All five

---

[9] The trial court articulated this prong of the due process analysis as whether the identification was "inherently incredible, given all the circumstances of the witness's ability to view the accused at the time of the crime."  JA 197.  This standard is clearly contrary to the "substantial likelihood" standard articulated by the Supreme Court.  *Biggers*, 409 U.S. at 198.  The state supreme court held that, "*[a]ssuming arguendo* that the identification procedures used here were impermissibly suggestive, we nonetheless conclude . . . that such procedures did

30

*Biggers* factors weigh against the reliability of the identification. *See id.* at 199-200.

First, Guzman's opportunity to view the perpetrator was extremely limited. *Biggers*, 409 U.S. at 199. He saw the man in the lobby from the waist up for only five seconds while he peered through a glass door. JA 158-161. Guzman was about twenty-five feet from the man, and while the lighting in the lobby was good, it also was filled with smoke. JA 176.

There is limited evidence regarding Guzman's degree of attention. *Biggers*, 409 U.S. at 199. Guzman said that he was focused on the man's face. JA 161. However, his primary concern at the time was safety, as he immediately ran to call police after briefly peering through the door. JA 173.

Guzman's description also was not accurate. *Biggers*, 409 U.S. at 199. In his initial interview with police, he said he paid attention to the man's nose, and described it as long, thin, and pointed. JA 175. By the time of his trial testimony, having seen Fowler in person, Guzman revised his memory to more closely match Fowler's broad nose. Guzman testified that "his nose was kind of like a boxer nose; it was kind of like blown out a little bit, or pointed in a way." JA 442.

---

not create a substantial likelihood of irreparable misidentification." *Fowler*, 548 S.E.2d at 619. The court offered no analysis to support this conclusion other than a string citation to three of its prior opinions. *Id.* Because the state supreme court failed to consider *any* of the relevant facts, its decision was the result of an unreasonable application of clearly established federal law. *Williams*, 529 U.S. at 397-98.

31

Moreover, Guzman's description of the man was completely inconsistent with the height and clothing description provided by Bharat Shah of either of the robbers. JA 279-290. Guzman described the man he saw as 6' to 6'1" tall and wearing a green military jacket. JA 126, 163. Shah, who had a better opportunity to view the two robbers, said in his final statement to police that one of the men was 5'4" and wearing a black checked flannel shirt, and the other was a "little taller" than 5'4" and wearing a red checked flannel shirt. JA 19-22.

Guzman's identification also lacked certainty. *Biggers*, 409 U.S. at 199. He did not identify Fowler in the January 8, 1996 photographic array. JA 135, 176. It was only after law enforcement used suggestive procedures that Guzman was able to identify Fowler. Even then, Guzman was only able to say that Fowler "most closely resembled" the man he saw in the motel lobby, and he identified two other persons in an April 3, 1996 array. JA 138, 141, 150, 177. Guzman confidently identified Fowler only when he confronted Fowler in a suggestive pretrial hearing. JA 169, 179-80; *Abdur Raheem v. Kelly*, 257 F.3d 122, 139 (2nd Cir. 2001) (noting that a witness's expressed certainty is not indicative of reliability when that certainty is "engendered by the suggestive element itself").

Finally, the length of time between the crime and the in-court confrontation was significant. *Biggers*, 409 U.S. at 199-200. Approximately twenty-two months had passed between the date of the crime and the date that Guzman confronted

32

Fowler in the pretrial hearing. Accordingly, based on the totality of the circumstances and the *Biggers* factors, there was a substantial likelihood that Guzman misidentified Fowler.

*Conclusion*

The state courts' decision that Guzman's identification of Fowler did not violate due process was based on an unreasonable application of clearly established Supreme Court precedent. The state courts unreasonably imposed an intent consideration, unreasonably considered Guzman's confidence in assessing suggestiveness, and failed to consider the cumulative effect of Guzman's multiple interactions with law enforcement. Viewed in light of a reasonable analysis, the admission of Guzman's identification violated due process.

The admission of Guzman's identification also prejudiced Fowler. Without Guzman, the only evidence linking Fowler to the crime was the testimony of four informants, all of whom approached the State with supposed information about Fowler's case in the hopes of receiving favorable deals and sentencing reductions for their own criminal activity. Accordingly, this Court should grant a certificate of appealability and issue a writ of habeas corpus.

## II.    THE STATE SUPREME COURT UNREASONABLY CONCLUDED THAT THE ADMISSION OF THE STATEMENTS OF BHARAT SHAH DID NOT VIOLATE FOWLER'S RIGHT TO CONFRONTATION UNDER THE UNITED STATES CONSTITUTION.

### *Introduction*

The statement of Bharat Shah, the surviving victim of the shooting, was critical to the State's case.  No eyewitness had a better view of the crime than Shah.  Jimmy Guzman's view of the scene had been so fleeting and obstructed that he never actually saw the crime take place; in his trial testimony, he described seeing only one man he did not recognize standing behind the motel lobby front desk.  JA 431-33.  Only Shah could describe the actual circumstances of the crime. JA 282.  As the State acknowledged in its argument, without Shah's statement, "[t]here's no[] direct evidence of the person that shot Bobby Richmond."  JA 299.

Yet, Shah did not testify at trial.  His recorded statements were admitted through the testimony of police officers, thereby depriving Fowler of the opportunity to confront and cross-examine Shah on discrepancies in his descriptions.  JA 585-86, 615-16, 1048-50.  Given Shah's multiple contradictory statements, the state supreme court's determination that Shah's statements were trustworthy was an unreasonable application of clearly established federal law. *See Fowler*, 353 N.C. at 614-16; 28 U.S.C. § 2254(d)(1) (2013).

34

*Relevant Facts*

Shah was an employee of the Howard Johnson's motel and the surviving victim of the shooting.  JA 332.  At the time of the murder and subsequent trial, Shah was an Indian citizen with permanent resident status in the United States.  JA 233, 236, 333.  Following the murder, Shah made three statements to police.

Sergeant Leonard, the first officer to respond to the shooting, spoke to Shah immediately after arriving at the scene.  JA 243-45.  Shah, who had been shot and was "going in and out of consciousness," told Leonard that the suspects were two black males, one of whom wore a green jacket, and that they had been in the motel earlier that night.  JA 244, 248.

The next day, on January 1, 1996, Investigator Anselmo interviewed Shah at the hospital.  JA 253-54.  Shah was on pain medication but told Anselmo he did not feel intoxicated.  JA 254.  This time, Shah said the suspects were two black males in their mid-twenties, both 5'7", with thin builds.  JA 250.  One male wore a black and gray flannel shirt; the other male, who Shah identified as the shooter, wore a red flannel shirt; both wore red and black striped ski caps.  JA 250-51.

On January 8, 1996, Investigator Fish conducted a taped interview with Shah at the hospital.  JA 263-64, 268.  Now, on this third occasion, Shah told police that one of the robbers was 5'4" and wore a black checked flannel shirt, and the other was a "little taller" than 5'4" and wore a red checked flannel shirt; both wore dark

35

wool caps.  JA 19-22.  After the interview, Fish showed Shah two photographic arrays, at least one of which included a photograph of Fowler.  Shah did not make an identification.  JA 129-32.

*State Court Adjudication*

The State filed notice before trial of its intent to offer, as exceptions to the state law hearsay rule, Shah's statements on the night of the shooting, the notes from Investigator Anselmo's interview of Shah on January 1, 1996, and the taped interview with Shah made by Investigator Fish on January 8.  JA 10, 27.  Following a pretrial hearing, the trial court ruled that Shah's statements from the night of the shooting were inadmissible, but that his subsequent statements on January 1 and 8 were admissible under the state law residual hearsay exception.  JA 337-40.  The trial court did not consider whether the admission of Shah's statements would violate the Confrontation Clause.  *Id.*

At trial, Anselmo testified, over Fowler's objection, regarding the substance of Shah's statements on January 1, 1996.  JA 584-86, 615-16.  The recording and transcript of Shah's January 8, 1996 interview were also played for and published to the jury over Fowler's objection.  JA 1048-50.

On direct appeal, the North Carolina Supreme Court considered the Confrontation Clause claim, but held Shah's statements admissible.  *Fowler*, 353 N.C. at 614-16.

36

*Analysis*

The Supreme Court has held that that the Confrontation Clause permits the admission of hearsay statements only if the State can (1) "produce, or demonstrate the unavailability of, the declarant" and (2) demonstrate that statement "bears adequate 'indicia of reliability.'"[10]  *Ohio v. Roberts*, 448 U.S. 56, 65-66 (1980). There is a "presumption that a hearsay statement is not worthy of reliance at trial" unless there exists "an affirmative reason [that the statement was reliable], arising from the circumstances in which the statement was made . . . ."[11] *Idaho v. Wright*, 497 U.S. 805, 821 (1990).  Specifically, the State bears the burden of proving that the statement "contains 'particularized guarantees of trustworthiness' such that adversarial testing would be expected to add little, if anything, to the statements' reliability."  *Lilly v. Virginia*, 527 U.S. 116, 125 (1999).  This determination must be made based on the "totality of the circumstances . . . that surround the making of the statement" and not other corroborating evidence.  *Wright*, 497 U.S. at 819.

---

[10] The Supreme Court substantially revised its Confrontation Clause jurisprudence in *Crawford v. Washington*, 541 U.S. 36 (2004). That case, however, was published after the state supreme court's decision in *Fowler* and, thus, is not applicable in this case.

[11] The exception to this rule is that reliability can be "inferred . . . where the evidence falls within a firmly rooted hearsay exception." *Roberts*, 448 U.S. at 66. The Court, however, has held that the residual hearsay exception, upon which the admission of Shah's statement relied, is not firmly rooted. *Wright*, 497 U.S. at 817; JA 338.

The state supreme court unreasonably concluded that Shah's statements were reliable under the totality of the circumstances. *See Wright*, 497 U.S. at 819. The court's analysis was unreasonable in that it "failed to evaluate the totality of the available [] evidence" weighing against reliability. *Williams*, 529 U.S. at 397. In its opinion, the court noted the following factors as weighing in favor of reliability: Shah "spoke from personal knowledge"; he was "motivated to speak truthfully to law enforcement officers to aid in the quick capture of the perpetrator"; he "never recanted his version of the attack"; and he "did not make his statements to receive any benefit from the state or to avoid prosecution." *Fowler*, 548 S.E.2d at 616. These factors relate largely to Shah's motivation for *honesty* without considering other reasons, such as poor memory, that would make his statement unreliable.

The state supreme court ignored several other factors that undermined the reliability of the statements. Most notably, the court did not consider the contradictions within Shah's own statements to police. In his January 1 statement, Shah described the perpetrators as the same height, 5'7". JA 250. Only a week later, on January 8, Shah stated that one robber was 5'4" and the other was a "little taller" than 5'4". JA 19-22. While Shah may have believed he was being truthful, both of these statements cannot be true. Yet, the state supreme found both statements to be reliable. *Fowler*, 548 S.E. 2d at 616.

38

Other factors also weigh against the reliability of the statements. The description of the perpetrators Shah provided on the night of the shooting—men who had been in the motel earlier that night, one of whom wore a green jacket— contrasts sharply with the January 1 and 8 statements later admitted at trial. JA 244. In the January 1 and 8 statements, Shah never told police he had seen the perpetrators in the motel earlier that night, and he described their clothing as black and red flannel shirts. JA 19-22, 250-51. Moreover, Shah had experienced a traumatic injury during the robbery, and he was on pain medication. JA 254. It is not surprising that his statements were unreliable and inconsistent.

Finally, the setting in which Shah made his statements lacked guarantees of trustworthiness. As this Court has noted, grand jury testimony, for instance, is often trustworthy because it "is given in the solemn setting of the grand jury, under oath and the danger of perjury, and in the presence of jurors who are free to question witnesses and assess their credibility and a court reporter who prepares an official transcript of the testimony." *United States v. McHan*, 101 F.3d 1027, 1038 (4th Cir. 1996); *see also United States v. Bros. Const. Co. of Ohio*, 219 F.3d 300, 310 (4th Cir. 2000); *United States v. Murphy*, 696 F.2d 282, 286-87 (4th Cir. 1982). The setting in which Shah's statements were made can be readily contrasted with that of grand jury testimony. Shah was not in a courtroom; he was not under oath; and he could not be questioned by jurors. The only party with the

39

opportunity to ask questions was the State. The state supreme court unreasonably failed to consider these facts in its analysis.

*Conclusion*

In short, Shah was a critically important but flawed witness for the State. JA 299. His descriptions of the perpetrators were inconsistent with each other and with the description provided by Guzman. By introducing Shah's statements through police officers, the State was able to present important evidence to the jury without the risk of subjecting Shah to confrontation and cross-examination on his multiple inconsistent statements. No court could have reasonably concluded "adversarial testing would be expected to add little, if anything, to the statements' reliability" when Shah was not present to respond to questions about these inconsistencies. *See Lilly*, 527 U.S. at 125. Accordingly, this Court should grant a certificate of appealability and issue a writ of habeas corpus.

**III.    FOWLER WAS DENIED HIS RIGHT TO A FAIR AND IMPARTIAL JURY AFTER JIMMY GUZMAN'S IN-COURT OUTBURST; THE STATE COURT'S DECISION WAS BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS AND INVOLVED AN UNREASONABLE APPLICATION OF FEDERAL LAW.**

*Introduction*

Guzman was the prosecution's key witness against Fowler at trial. Although police had attempted to obtain identifications from two other eyewitnesses, Guzman was the only eyewitness who identified Fowler as the individual he saw in

the motel lobby when Bobby Richmond was shot and killed. Guzman was critical to the prosecution's case against Fowler to corroborate the unreliable, incentivized informant testimony of the other witnesses. Given the importance of Guzman's testimony, his outburst immediately following his testimony in court, in full view of the jury, warranted a mistrial and violated Fowler's constitutional rights.

Despite clear evidence from four of the twelve jurors who would later decide Fowler's guilt and sentence him to death, the trial court refused to declare a mistrial and thus the jury determining Fowler's fate was irrevocably tainted by the outburst. The state courts ignored clear evidence from jurors that Guzman's outburst affected their ability to deliberate fairly. The state courts' failure to find prejudice was unreasonable in light of the evidence presented and contrary to Supreme Court precedent. The adjudication of this claim involved an unreasonable determination of the facts in light of the state court record because the state courts failed to consider and discounted substantial evidence that showed that Guzman's outburst tainted the jury. Furthermore, the state courts' decision resulted from an unreasonable interpretation of clearly settled federal law relating not only to the right of the accused to have a fair and impartial jury but also to the effective assistance of appellate counsel. Accordingly, Fowler is entitled to relief pursuant to 28 U.S.C. §2254(d).

*Relevant Facts*

Near the end of his redirect examination, Guzman stated, concerning his identification of Fowler as the man he glimpsed in the Howard Johnson's motel lobby, "It's him.  He's got the unique look; he looks innocent . . . . But there's no question in my mind, no doubt about it; it's him."  He further testified, "I can recognize this individual right now, as him being there in 1995 on December 31st, at the lobby."  JA 472-73.

Having just claimed that there was "no question" in his mind that Fowler was in the motel lobby at the time of the crime, Guzman then, as he left the witness stand, turned to Fowler and said, "I hope you fry man; I really do."  JA 473. Because this outburst occurred after Guzman had completed his testimony, there was no opportunity for defense counsel to examine Guzman concerning his statements.

Guzman was not an idle bystander to the events in the Howard Johnson's on December 31, 1995.  As Guzman testified, he was at the Howard Johnson's that evening for a party celebrating the opening of his restaurant adjacent to the motel lobby.  JA 429.  Guzman had invited his family and friends to the celebration, including Richmond and Shah.  JA 429, 440-441.  Guzman's emotional testimony made the jury aware of his friendship with Richmond.  When the prosecutor showed Guzman a photograph of Richmond during his testimony, Guzman "began

42

to cry; [he] had to pull out his handkerchief." JA 489-99. Thus, the only individual to testify as an eyewitness to the crime knew both victims, had worked in close proximity to them, and had developed a friendship with them. Guzman's assertion as to the appropriate sentence for Fowler was powerful and prejudicial.

All in the courtroom recognized the significance of Guzman's outburst. Defense counsel immediately objected to Guzman's inflammatory comments. The trial court sustained defense counsel's objection and cautioned the jury to disregard Guzman's comments. JA 473. *See also* JA 503. (Trial counsel noted, "In my twenty odd years of practice in numerous Courts, I've never had that happen."). The trial court then permitted the State to proceed with its next witness.

After the examination of an additional witness and the jury was excused, the trial court, clearly troubled by Guzman's outburst, inquired whether defense counsel desired a curative instruction. JA 480-82. Defense counsel asked for a mistrial, arguing that a curative instruction was insufficient as there was no way to "unring that bell." JA 481-82. Despite the inflammatory nature of Guzman's comments, however, the trial court denied the motion for mistrial. JA 484. The court then stated it would give a curative instruction if defendant agreed. JA 485. The trial court then gave a curative instruction without making any individual inquiry of the jurors. JA 487-89. Following the instruction, the trial court then asked the jurors, as a group, whether they would be able to follow its instructions.

43

Unsurprisingly, the jurors stated that they would.  JA 489.  The trial court was then in recess for the day.

The next day, before the jury was called in, the trial court addressed Guzman, who had been ordered to appear by the court.  The trial court made it clear that Guzman's comments were not innocuous, noting, "The comments that you made when you got down from the witness stand yesterday have created somewhat of a problem, and I've spoken to the jurors trying to avoid any problems that may result from those comments.  But those comments were inappropriate, and they've interfered with the business of this Court . . . ."  JA 498.  The trial court then indicated it was citing Guzman for contempt and stated that, at the conclusion of the trial, it would determine whether Guzman's actions rose to the level of contempt of court and, if so, what sanctions might be imposed.[12]  JA 500. Clearly, Guzman's outburst was significant given the trial court's contemplation of later finding Guzman in contempt of court.

Defense counsel then renewed their motion for mistrial, arguing that no curative instruction could undo the "irreparable harm" resulting from Guzman's outburst.  JA 504.  While having denied defense counsel's first motion for mistrial the day before, the trial court signaled it had not made a final decision on the

---

[12] It is unclear from the record whether the trial court pursued the contempt citation against Guzman after trial.

44

matter, stating, "I haven't made up my mind yet." JA 505. The trial court then noted that the appropriate recourse was an individual inquiry of the jurors. JA 505.

The evidence from the inquiry revealed that, despite the trial court's curative instruction, the response by all jurors the day before, and the passage of time between Guzman's outburst and the inquiry the next day, a significant number of jurors still indicated they would be unable to put Guzman's comments out of their minds.

Juror Stuart Hair stated he had joked with the other jurors that the hardest of the trial court's instructions was "to not form any opinions," that it was

> difficult when presented with evidence to not, you know, begin to form an opinion. And so I've tried to keep an open mind about that . . . . And I'll admit Mr. Guzman's testimony yesterday as he was, you know walking out and his outbursts; *initially, that swayed me real big*, you know . . . . And so, *while it's impossible to for me at least to completely eliminate what he said*, that did not cause me to form any opinion of his testimony, nor of the guilt or innocence of the Defendant.

JA 509-10 (emphasis added). In response to additional questioning, he said he did not think Guzman's outburst would cause him to make his decision in a different way, and felt like he could be fair. JA 510. While Hair thought Guzman's outburst would not affect his determination of Fowler's guilt or innocence, no mention was made as to whether the main thrust of Guzman's comments—that Fowler should "fry" for the death of Richmond—was going to influence his decision as to sentencing. As defense counsel argued, there was no way to undo

45

the prejudicial impact such provocative comments would have on the ultimate issue facing the jury.

Juror Joyce Carpenter, when questioned by the trial court, said she had not formed any opinion as to guilt or innocence, but made no mention of the impact the comments would have on her sentencing decision, and then admitted that "I can't really say I've really put it out of my mind, but I'm not making it an important part of any thoughts that I'm having. *You know, once you hear something and see something, it's hard to say I've completely erased it*." JA 514 (emphasis added). Juror Carpenter spoke to the very problem trial counsel argued to the trial court: once the jurors heard Guzman's provocative words, there was no way to unring that bell.

While Juror Carpenter then said, "I certainly would not let it have any bearing on my evaluation," the trial court then again limited the inquiry to whether the juror felt the comments would influence the guilt or innocence decision-making process. While conducting the inquiry of the jurors, the trial court signaled to the jurors that its only concern was whether the inflammatory comments would affect their guilt or innocence determination and not, more importantly, whether the comments would affect their sentencing decision. Carpenter later reiterated that she *could not* "truly erase" Guzman's comments from her mind. JA 515.

46

Juror Govindbhai Patel, when questioned by the trial court, acknowledged he had formed "[n]ot a complete opinion" as to Fowler's guilt or innocence and that he "believe[d] he still had an open mind." JA 521-22. The trial court then suggested a reason why Guzman might have made such an outburst, claiming "there are all sorts of reasons why a witness might make a comment like that, one of which may simply be the fact, that [Guzman] was upset with [defense counsel] for the way that [defense counsel] questioned him.[13] JA 524.

Juror Patricia Connors also revealed she had heard Guzman's outburst. When asked whether anything had caused her to form an opinion as to the guilt or innocence of Fowler, she said "the information's not all in yet." Again, the trial court never asked whether Guzman's comments would affect her sentencing decision. She further explained that the trial court's discussion of the comments made it "a little more difficult to strike." JA 531. She then admitted, "I don't think you can completely strike anything" but she thought she was still comfortable with her ability to put it out of her mind. JA 534.

In addition to these four jurors, one juror, Heike Sweeney, acknowledged that she had heard Guzman's outbursts, and while she stated she understood this outburst had no place in the courtroom, she also admitted that his comments were

---

[13] The trial court also suggested this same reasoning for Mr. Guzman's outburst when questioning Juror Connors and Juror Sweeney. JA 535, 544. The trial court's reasoning seems part of the trial court's effort to dismiss the real impact Guzman's extrajudicial statements.

not completely erased from her thoughts as she "just looks at [Guzman's outburst] in the back of [her] mind." JA 543.

Juror Dandris Davis stated that Guzman's outburst did not bother her but that Fowler's smile struck her as "odd." JA 546. She affirmed that she wouldn't let Guzman's comments "play a part" and "wouldn't even put that into consideration." JA 547. After the trial court questioned the remaining jurors, it denied Fowler's renewed motion for mistrial. JA 560. Fowler renewed his motion for mistrial the next morning when court resumed but it was again denied. The trial court, however, dismissed Juror Davis "[i]n the exercise of discretion and out of abundance of caution," replacing Davis with alternate juror Sandra Gamble. JA 695. Her dismissal came more than three days after she first indicated that she had noticed a smile on Fowler's face when Guzman made his comments.

The four jurors who admitted that they could not erase Guzman's inflammatory comments from their minds remained on the jury and convicted and sentenced Fowler to death.

*State Court Adjudications*

Fowler raised this claim in his state post-conviction pleading, arguing that appellate counsel had rendered ineffective assistance of counsel in failing to raise

that his right to a fair and impartial jury had been violated due to Guzman's inflammatory comments following his testimony at trial.[14]  JA 1508.

The state post-conviction court held that the trial court did not abuse its discretion in denying Fowler's motion for a mistrial.  The state court further held that Fowler failed to demonstrate prejudice because the individual questioning of the jurors revealed that nothing had occurred to cause them to form any opinion as to Fowler's guilt or innocence.  JA 1588.

### Right to Fair and Impartial Jury

The Sixth and Fourteenth Amendments to the United States Constitution guarantee a criminal defendant the right to trial by an impartial jury.  *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *Duncan v. Louisiana*, 391 U.S. 145, 160 (1968); *Jones v. Cooper*, 311 F.3d 306, 310 (4th Cir. 2002).

"In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors.  The failure to accord a fair hearing violates even the minimal standards of due process."  *Fullwood v. Lee*, 290 F.3d 663, 677 (4th Cir. 2002) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal quotation marks omitted).  *See also Parker v. Gladden*, 385 U.S. 363, 366 (1966) ("[P]etitioner was entitled to be tried by 12, not 9 or even 10, impartial and

---

[14] In the state court proceedings, post-conviction counsel representing Fowler at the MAR stage entered into a stipulation regarding this claim.  The parties, at that time, agreed that no evidentiary hearing was necessary to resolve the issue.

unprejudiced jurors.").  Thus, the right to trial by a fair and impartial jury becomes compromised when only one individual juror cannot remain free from bias or impartiality.

Interference with the jury by a witness may rise to the level of violating a criminal defendant's right to a fair trial.  "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is . . . deemed presumptively prejudicial."  *Remmer v. United States*, 347 U.S 227, 229 (1954).  *See also Parker*, 385 U.S. at 364 ("[P]rivate talk, tending to reach the jury by outside influence" is constitutionally suspect because it is not subject to "full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.")

*Ineffective Assistance of Appellate Counsel*

In order to prevail on a claim of ineffective assistance of appellate counsel, a petitioner in this Court

> must normally demonstrate (1) that his "counsel's representation fell below an objective standard of reasonableness" in light of the prevailing professional norms, *Strickland,* 466 U.S. at 688, and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id*. at 694. *See Smith v. Robbins*, 528 U.S. 259, 120 S. Ct. 746, 764, 145 L. Ed. 2d 756 (2000) (holding that habeas applicant must demonstrate that "counsel was objectively unreasonable" in failing to file a merits brief addressing a non frivolous issue and that there is "a reasonable probability that, but for his

50

> counsel's unreasonable failure . . . , he would have
> prevailed on his appeal").

*Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000).

### *Guzman's Outburst Resulted in a Jury Tainted by Bias*

Given the nature of Guzman's emotional comments concerning the ultimate issue for the jury's consideration—whether Fowler should live or die for the murder and robbery of Bobby Richmond—the trial court unreasonably found that Fowler failed to show any prejudice as a result of Guzman's outburst. Despite jurors' statements to the contrary and the overwhelmingly inflammatory nature of the comments made, the state post-conviction court found that "when questioned by the trial judge, each juror stated that nothing had occurred during the course of the trial that caused them to form any opinion about the guilt or innocence of Fowler." JA 1588. The remarks here were ostensibly made to Fowler but in the hearing of all jurors and concerning the ultimate issue for the jury's consideration. "Extrajudicial remarks directed at influencing a juror's resolution of an issue under deliberation, even if the remarks are isolated, may contravene the constitutional guarantee to a fair trial." *Fullwood*, 290 F.3d at 677 (citing *Parker*, 385 U.S. at 363-65).

The state courts discounted the prejudice to Fowler engendered by Guzman's outburst and gave cursory consideration to determining that there was no reasonable possibility that the jury would be influenced by the outburst. *See*

51

*United States v. Basham*, 561 F.2d 302, 320 (4th Cir. 2009). In *Basham*, this Court held that courts must look to a wide variety factors, including, the extent of the improper communication, the type of information communicated, the timing of the exposure, and the strength of the Government's case. *Id*.

Here, numerous factors weighed in favor of a finding of prejudice: the substantive nature of the comments, the fact that the comments by Guzman contained entirely inadmissible information,[15] the fact that the content was not cumulative of other information brought to the jury's attention, the clear evidence from a number of jurors that they would not be able to erase the comments from their minds, and the weakness of the State's case against Fowler. Furthermore, the fact that Guzman had just completed his testimony and was still in the courtroom imbued his outburst with even more power.

---

[15] The nature of the comments here, on the issue of whether Fowler should be given the death sentence, was clearly not admissible at Fowler's trial as part of any witness's testimony. It is well settled that neither a lay witness nor an expert witness "can testify that, in his or her opinion, a criminal defendant is guilty of the crime charged." 2 Kenneth S. Broun, *Brandis & Broun on North Carolina Evidence* § 190 (6th ed. 2004). A witness is no more able to offer evidence that a death sentence is warranted. *See* 1 *McCormick on Evidence* §12 n. 12 (6th ed. 2006) ("Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach . . . ."); *see also* Payne v. Tennessee, 501 U.S. 808, 830 n.2 (1991) (Eighth Amendment prohibits evidence of victim's family members' characterizations and "opinions about the crime, the defendant, and the appropriate sentence.").

This Court found relief for a habeas petitioner warranted in circumstances far less compelling than those present here. In *Stockton v. Virginia*, the petitioner was granted habeas relief after this Court determined that comments by a restaurant owner to the jury eating lunch during deliberations were prejudicial to the defendant, thus warranting the vacatur of his death sentence. 852 F.2d 740 (4th Cir. 1988). While deliberating Stockton's sentence, the restaurant owner approached the jury and said, "they ought to fry the son of a bitch." *Id*. at 742. The jury then sentenced the defendant to death. *Id*. Recognizing that these comments could not be considered "innocuous" and, indeed, recognizing that no comments in a capital defendant's trial could be "more pointed" than those concerning the ultimate determination by the jury, the defendant was afforded relief. *Id*. at 745.

In assessing the prejudicial impact of the third party comments on the jurors' minds, this Court in *Stockton* noted, "[The jurors] were exposed to the type of pointed and prejudicial suggestion whose utterance encourages the all too human tendency to pursue the popular course." *Id.* at 746. The same is true here. Furthermore, while the inflammatory comments in *Stockton* were made by a stranger with no ties to the jurors and no ties to the crime, Guzman was an eyewitness to the crime, had testified as a key witness at the trial, and was friends with the victims. The prejudicial effect was even more powerful.

Here, as well, there was no misconduct on the part of the jurors. Nevertheless, there are many factors weighing in favor of finding that the prejudicial nature of the comments could not be rectified by a curative instruction: (1) the unauthorized contact with the jury concerned the ultimate issue for the jury's consideration, (2) the inflammatory nature of the comments, and (3) the fact—not present in *Stockton*—that the comments were made by a friend of the victim who was the only eyewitness to identify Fowler. Thus, a mistrial was warranted in order to protect Fowler's constitutional rights to a fair and impartial jury.[16]

As defense counsel argued in support of a mistrial, Guzman's outburst was emotional and it would be impossible for jurors deciding Fowler's fate to keep that out of their mind. JA 483. Defense counsel rightly feared that any inquiry into the outburst would "bring[] it back to their mind" but was also concerned that not to inquire would "compound" the prejudicial nature of the remark. JA 484. This dilemma could be fairly resolved only by a mistrial.

---

[16] Left unresolved by the United States Supreme Court is whether the presumption of prejudice at issue in *Stockton* and in *Remmer* also would apply to the situation at issue here, where the comments concerning matters under the jury's purview are made by a third party and rise above the level of merely innocuous comments. However, in denying Petitioner's petition, the district court assumed there was a presumption of prejudice. JA 2179 (stating "[t]he trial court found no evidence of bias, thereby rebutting any presumption of prejudice engendered by Guzman's remarks").

54

Despite the inflammatory nature of Guzman's non-testimonial comments, however, the trial court denied the motion for mistrial. JA 484. While the decision to grant or deny a motion for a mistrial is in the sound discretion of the trial court and such decisions are granted deference by reviewing courts, "deference by definition does not preclude relief." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

The trial court's curative instruction could not contain the prejudicial effect of Guzman's comments. A curative instruction, especially given the highly charged nature of Guzman's comments, was not sufficient and did not render the jury able to undertake its responsibilities unaffected by Guzman's outburst. "Curative instructions . . . are not always adequate. There are instances where the jury is exposed to inadmissible evidence which could make such a strong impression that instructions to disregard it may not remove its prejudicial effect." *United States v. Brevard*, 739 F.2d 180, 182 (4th Cir. 1984). *See also Goldsmith v. Witkowski*, 981 F.2d 697, 703 (4th Cir. 1993) ("The presumption of cure by a court's instruction is overcome when there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant.") (internal quotation marks omitted)). Such was the case here.

The state court wholly glossed over the facts developed following Guzman's outburst. The state court did not consider the entirety of the record and

55

conveniently ignored the evidence that demonstrated jurors were tainted by Guzman's comments. In an effort to minimize how powerful Guzman's comments had been, the court found that "some [of the jurors] admitted it was hard to completely eliminate from their minds what Mr. Guzman said, but each juror indicated that what they had heard would have no bearing upon their deliberations in this case and that they could be fair and impartial." JA 1588-89. In truth, when questioned by the trial court, at least four jurors admitted that Guzman's comments had an impact and could not be forgotten. All four of these jurors who acknowledged the possible impact of Guzman's outburst remained on the jury to decide Fowler's fate.

Further complicating matters, Guzman's inadmissible comments went to the issue of the appropriate penalty and, at the time of the outburst, Fowler's guilt— which was highly contested—had not yet been decided. Any inquiry on the impact Guzman's highly provocative comments had on the issue of punishment would necessarily have signaled to the jurors that Fowler's guilt was to be assumed. As the jurors were not—and could not be—questioned as to the impact of the interference on their determination of Fowler's sentence, the outburst by Guzman could not be properly contained through juror questioning and curative instructions because any questioning as to the sentencing decision that might reveal a juror's bias also risked creating it.

56

In conducting the individual inquiry, the trial court suggested to three jurors that the reason for Guzman's outburst may have been because of the nature of trial counsel's questioning. *See* JA 524 (suggestion by trial court that Guzman may have made his comments because "he was upset with [defense counsel] for the way that [defense counsel] questioned him"); *see also* JA 535, 544. The illogical nature of the trial court's reasoning seems part of the trial court's effort to dismiss the real impact Guzman's extrajudicial statements would have had on jurors. Furthermore, the trial court compounded the problem by disparaging trial counsel and suggesting trial counsel was too zealous in defending Fowler. For the trial court to criticize trial counsel for vigorously cross-examining the State's most important witness had the potential to further poison the jurors against Fowler while giving unwarranted credibility to Guzman's dubious identification.[17]

Given the particular circumstances present in Fowler's case, there was a substantial risk that the jury would be swayed by Guzman's comments and would

---

[17] Even the trial court's handling of the dismissal of Juror Davis added to the detrimental effect of Guzman's inflammatory comments. During the individual inquiry of the jurors, Juror Davis indicated Guzman's outburst did not bother her but that Fowler's smile struck her as "odd." JA 546. She affirmed that she wouldn't let Guzman's comments "play a part" and "wouldn't even put that into consideration." JA 547. A day later the trial court determined that Juror Davis was no longer fit to serve and she was dismissed from the jury. The trial court made no inquiry of Juror Davis to ensure that what made her unfit to serve had not further tainted the rest of the jury, including the four jurors who had expressed an inability to erase Guzman's inflammatory words from their mind.

57

want someone to pay for the murder and robbery of Guzman's friend Richmond and the assault on Shah.  The jury knew that there was no other defendant facing criminal charges for these offenses.  Thus, the jury could punish only Fowler. From this crucial witness, the jury then heard the inadmissible evidence that he thought Fowler should pay the ultimate price.  There was no way at that point for the trial court to ensure that the jurors—who admitted to hearing that Guzman thought Fowler should die for his crimes—would not let Guzman's outburst weigh on their consideration of the appropriate sentence.

In light of the clear prejudicial impact of Guzman's outburst and the importance of preserving the integrity of the jury proceedings, the state courts' determination of the facts was unreasonable in light of the evidence presented and an unreasonable interpretation of federal law.  The trial court's removal of one juror did not eliminate the prejudicial impact of Guzman's inflammatory comments and trial counsel's renewed motion for a mistrial should have been granted in order to protect Fowler's right to a fair and impartial jury.

### *Appellate Counsel Rendered Ineffective Assistance*

Appellate counsel, in failing to raise this issue before the state supreme court on direct appeal, rendered Fowler ineffective assistance of counsel in violation of *Strickland v. Washington*, 466 U.S. 668, 688 (1984) (deficient performance shown where counsel's representation fell below an objective standard of responsibility)

and *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (prejudice shown if there is a reasonable probability that defendant would have prevailed on appeal). Under any fair minded reading of the facts and application of the law, Fowler's appellate counsel failed to function as competent counsel guaranteed by the Sixth Amendment, and his deficient acts and omissions unquestionably prejudiced Fowler.

Guzman's outburst was highly inflammatory and went to the ultimate issue for the jury's consideration: whether Fowler should be sentenced to death. Given that four jurors admitted that they could not erase these highly-charged comments from their minds, Fowler was deprived of his right to a fair and impartial jury and appellate counsel rendered ineffective assistance by failing to raise this non-frivolous issue, as there is "a reasonable probability that, but for his counsel's unreasonable failure . . . , he would have prevailed on his appeal." *See Smith*, 528 U.S. at 285.

Accordingly, this Court should grant a certificate of appealability and issue a writ of habeas corpus.

## Conclusion

For the reasons presented here, Fowler respectfully asks this Court to grant a certificate of appealability as to the issues stated herein, vacate the decision of the District Court denying relief on all of Fowler's claims, grant a writ of habeas

corpus on Fowler's claims, or remand this case to the District Court for further proceedings.

<u>Request for Oral Argument</u>

Because of the complexity and importance of the issues presented by this appeal, Fowler requests oral argument.

Respectfully submitted, this the 26th day of August, 2013.


/s/Shelagh Rebecca Kenney
Shelagh Rebecca Kenney
shelagh@cdpl.org

/s/Mark J. Pickett
Mark J. Pickett
mpickett@cdpl.org


Attorneys for Petitioner-Appellant

Center for Death Penalty Litigation
201 West Main St.
Suite 301
Durham, NC 27701
919-956-9545
Fax: 919-956-9547

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief has been prepared using fourteen point, proportionally spaced Times New Roman typeface.  The software version used was Microsoft Word 2007.

Exclusive of the table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules or regulations; and the certificate of service, the brief contains 13,891 words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

August 26, 2013                                    /s/Mark J. Pickett_____
                                                   Mark J. Pickett

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing Brief and Joint Appendix with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit using the CM/ECF system, which will send notification to Sonya Michelle Calloway-Durham at scalloway@ncdoj.gov, N. C. Department of Justice, P.O. Box 629, Raleigh, NC 27602.

Respectfully submitted this the 26th day of August, 2013.


/s/Mark J. Pickett
Mark J. Pickett